UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| WALTER HARRIS, ) | |
| ) | |
| Plaintiff, ) | **COMPLAINT** |
| ) | |
| v. ) | Civil Action No.: _____ |
| ) | [Jury Trial Demanded] |
| WOLFSPEED, INC. f/k/a CREE, INC., ) | |
| ) | |
| Defendant. ) | |

NOW COMES Plaintiff, WALTER HARRIS, by and through undersigned counsel, and complains against Defendant WOLFSPEED, INC. f/k/a CREE, INC., as follows:

## INTRODUCTION AND NATURE OF THE CASE

Plaintiff brings this action against Defendant for its violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1991, 42 U.S.C. § 1981, for unlawful employment practices on the basis of retaliation. Plaintiff seeks all available remedies including, but not limited to, compensatory, punitive and liquidated damages, as well as available equitable relief pursuant to 42 U.S.C. § 2000e-5(f)-(k), and 42 U.S.C. § 1981a, and as otherwise authorized pursuant to law.

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1991, as the claims for relief asserted herein arise under federal law, and under 28 U.S.C. § 1343(a)(4), as the claims herein seek relief under acts of Congress providing for the protection of civil rights.

2. This Court has personal jurisdiction over Defendant because it operates within the State of North Carolina and within this District.

1

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

4. Plaintiff Walter Harris ("Plaintiff" or "Mr. Harris") is a citizen and resident of Wake County, North Carolina. Mr. Harris (black male) was employed by Defendant Wolfspeed, Inc., from on or about February 19, 2017, until Defendant terminated his employment on January 25, 2023. At all times relevant hereto, Plaintiff constituted an "employee" pursuant to all applicable statutes.

5. Defendant Wolfspeed, Inc. ("Defendant" or "Wolfspeed") is a domestic corporation organized and existing under the laws of the State of North Carolina, with its principal office located at 4600 Silicon Drive, Durham, Durham County, North Carolina. At all times relevant hereto, Defendant has continuously employed at least 20 employees.

6. When Mr. Harris was first hired to work for Defendant, it operated under the entity name "Cree, Inc." until it changed its corporate name to "Wolfspeed, Inc." on or about October 4, 2021. Upon information and belief, Cree, Inc. and Wolfspeed, Inc. are the same legal business entity.

7. At all relevant times, Defendant has constituted an employer engaged in an industry affecting commerce in accordance with sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g), and (h).

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8. Mr. Harris signed and filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about March 13, 2023, alleging violations of Title VII.

9. The EEOC issued Mr. Harris a Notice of Right to Sue on or about September 25, 2023.

10. Mr. Harris complied with all deadlines related to the investigation of his formal administrative complaint.

11. All conditions precedent to the institution of this lawsuit have been fulfilled.

**FACTUAL ALLEGATIONS**

12. Mr. Harris was hired by Wolfspeed, Inc., then operating under the name Cree, Inc., as a semi-conductor operator on or about February 19, 2017. Throughout his employment, Mr. Harris was promoted to multiple new positions, ultimately being hired as a materials handler in mid- to late-2020.

13. As a materials handler, Mr. Harris was responsible for restocking supplies throughout Defendant's Durham manufacturing facility, responding to calls for immediate supply needs, and transporting products between facilities throughout the manufacturing process.

14. Mr. Harris was proud to be a Wolfspeed employee, and even referred people to apply for positions when one became available. Mr. Harris was committed to doing the best job possible and supporting Defendant's business goals. Throughout his employment, Mr. Harris received positive feedback about his performance, including multiple promotions as set forth above. Mr. Harris was never counseled or disciplined for any performance concerns or policy violations until the events set forth herein occurred.

15. During the COVID-19 pandemic, Mr. Harris sent an email to Margaret Chadwick ("Chadwick"), one of Defendant's Human Resources ("HR") representatives, asking if Wolfspeed could provide any incentives to the employees who were required to work on-site throughout the pandemic. Chadwick responded to Mr. Harris saying that Wolfspeed did "a lot" for its employees,

specifically stating, "we let y'all have Juneteenth." Mr. Harris was shocked by this comment, as Chadwick's response was clearly targeted toward black employees. However, Mr. Harris's request was not made on behalf of a specific race or group of employees.

16. On or about December 5, 2022, Mr. Harris and another black employee, Preston Oliver ("Oliver"), were in Wolfspeed's solvent storage room with a white coworker, Gabe Lambert ("Lambert"). Lambert made a comment to Oliver and Mr. Harris, but Mr. Harris did not hear what he said and asked Lambert to repeat himself. Lambert then began talking about a former black employee, stating she was built like a gorilla, monkey, or ape, and comparing her to the video game character Donkey Kong, a gorilla.

17. Mr. Harris immediately felt uncomfortable because of Lambert's comments and reported the behavior to acting supervisor, Ben Simon ("Simon"), the same day. Simon did nothing in response to Mr. Harris's complaint, so the following day, December 6, 2022, Mr. Harris reported Lambert's behavior via email to Defendant's HR department, including Chadwick and HR representative Sean Harrison ("Harrison"). Neither Chadwick nor Harrison acknowledged Mr. Harris's complaints.

18. Approximately one week later, an out-of-state HR representative contacted Mr. Harris to gather additional details about what happened, but never provided any further updates on any investigation or corrective action that would be taken. Mr. Harris did not receive any response from the local HR team directly responsible for the Durham facility employees.

19. A few days after Mr. Harris's telephone call with the out-of-state HR employee, Lambert complained to another employee that he was mad because Harris had reported Lambert to HR and that Defendant was talking about writing him up for his behavior. Lambert's attitude

4

made Mr. Harris very uncomfortable, and he began to feel unsafe having to work with Lambert every day, knowing that he was upset about the complaints Mr. Harris had made to HR.

20. After the initial telephone call with the out-of-state HR representative, Mr. Harris heard nothing from Defendant about any investigation or discipline. Accordingly, on December 16, 2022, Mr. Harris emailed Defendant's Chief Executive Officer ("CEO"), Gregg Lowe ("Lowe") reporting his concerns about the lack of response from the local HR department, and how poorly he felt Defendant was handling his complaints. Lowe contacted Mr. Harris the following day but provided no substantive response to his complaints.

21. Upon information and belief, Lowe also contacted the Durham HR department instructing them to review Mr. Harris's matter, so, on or about December 19, 2022, Harrison finally contacted Mr. Harris about his complaints – for the <u>first</u> time.

22. Harrison told Mr. Harris the Durham HR department had not contacted him because they had been "busy" and were waiting on some unidentified employee to return to the office to discuss the situation. Mr. Harris was confused by this comment, because everyone he believed needed to be involved in any investigation and/or discipline was in the office including Chadwick, Harrison, Simon, and Lambert. When Mr. Harris asked for clarification, the HR department said they had to talk to their supervisor.

23. Following this conversation, Mr. Harris continued to work hard, and attempted to avoid interacting with Lambert as much as possible to avoid his hostility. Mr. Harris reported Lambert's behavior to his supervisor, Simon, and even asked Simon if he could work at a different site during the shifts he worked with Lambert. Simon repeatedly denied Mr. Harris's requests to work at a different site, making comments such as "if you're uncomfortable, you should go home" rather than addressing Lambert's behavior. Over time, Mr. Harris became increasingly

5

uncomfortable having to work with Lambert every day, but Defendant still did nothing to address Lambert's behavior.

24. Lambert often made comments to other employees about his frustration with the complaints Mr. Harris made against him about his racial comments. Lambert said these things in Mr. Harris's presence, and intentionally spoke loud enough Mr. Harris would overhear, which only made Mr. Harris more uncomfortable.

25. On January 25, 2023, Mr. Harris received an unexpected telephone call from Simon and another one of his supervisors, Maresha Harrington ("Harrington"). During this call, Simon and Harrington informed Mr. Harris that Defendant decided to terminate his employment.

26. When Mr. Harris asked why they were firing him, Simon and Harrington said Defendant had been "investigating" him for a few weeks for time clock fraud. Until this telephone call, Mr. Harris was completely unaware and had never been informed of any concerns about his time clock usage. Mr. Harris denied any time clock problems. Regardless, Defendant did not initiate this investigation into Harris until Harris had reported to his supervisors and HR the racial comments and harassment by Lambert. Therefore, the investigation was in retaliation for his protected disclosures under Title VII.

27. In fact, contrary to their earlier statement as to the duration of the investigation, Defendant claimed in their EEOC position statement they began investigating him on January 24, 2023, only one (1) day before they fired him.

28. When Mr. Harris told Simon and Harrington that his termination was wrong, they simply said they were told this was HR's decision and there was nothing they could do about it.

6

# FIRST CLAIM FOR RELIEF
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981**

29. Plaintiff reiterates and realleges each of the preceding paragraphs and incorporates each by reference as if fully set forth herein.

30. Mr. Harris first contacted Defendant's HR department on December 6, 2022, to report Lambert's behavior. After hearing nothing regarding any investigation or disciplinary action against Lambert except a single telephone call from an out-of-state HR representative, Mr. Harris escalated his complaints to Defendant's CEO on December 16, 2022.

31. Instead of properly addressing Mr. Harris's complaints, apparently Defendant launched a secretive investigation into Mr. Harris in an effort to find any reason to justify terminating his employment. After Harris's complaints, Defendant did nothing to address the racism Mr. Harris constantly reported or racial hostility created by Lambert and Defendant.

32. Mr. Harris only received a response from the HR department at Defendant's Durham location after he contacted the CEO, yet his complaints were ignored, and he was told they needed to speak with their supervisor.

33. Mr. Harris heard nothing further until he was abruptly fired on January 25, 2023. Defendant notified Mr. Harris he was being terminated for time clock fraud.

34. Defendant's representatives told Mr. Harris he had been under investigation for the past few weeks, indicating that the investigation began <u>after</u> he complained numerous times about Lambert's behavior and HR's lack of response thereto. In its EEOC position statement, Defendant admitted the investigation began on January 24, 2023, after Mr. Harris complained about Lambert's behavior, and only one (1) day before Defendant fired Mr. Harris. Defendant's investigation was motivated by retaliatory intent.

35. Defendant did not give Mr. Harris the opportunity to refute the allegations against him. In fact, when Mr. Harris attempted to refute the allegations during the call terminating his employment, Defendant's representatives repeatedly changed their story about what the investigation revealed and the reason(s) for his termination.

36. Mr. Harris behaved in a manner similar to Defendant's other employees, who were not terminated.

37. Nevertheless, Mr. Harris was never given a warning or otherwise disciplined about any time clock issues during the nearly six (6) years he worked for Defendant before he was suddenly fired, nor was he given an opportunity to explain himself or refute the allegations.

38. In contrast, Defendant has a clearly advertised "zero tolerance" policy for racial harassment and discrimination, but it did not fire or take disciplinary actions against Lambert for his racial harassment and ongoing hostility toward Mr. Harris.

39. A causal connection exists between Mr. Harris's reports of racism and racial harassment and his termination, based on the temporal proximity between his complaints and the adverse employment action. Defendant initially claimed they had been investigating Mr. Harris for "a few weeks" prior to his termination, meaning such investigation would have begun *after* he complained of Lambert's behavior. In its EEOC position statement, Defendant makes this even clearer, stating they began investigating Mr. Harris for alleged time clock fraud on January 24, 2023, only weeks after he reported Lambert's behavior and one day prior to firing him, Defendant fired Mr. Harris less than two (2) months after reporting Lambert's behavior.

40. By Defendant's own statements within its EEOC position statement, it acted quickly to "investigate" Mr. Harris and fire him – all taking place within one (1) day. In contrast, Mr. Harris heard nothing from Defendant for weeks regarding his complaints against Lambert,

8

despite Defendant's advertised "zero tolerance" policy regarding harassment and discrimination. The abrupt nature of Defendant's decision to fire Mr. Harris clearly demonstrates their intention to simply find any reason to attempt to justify firing him, including fabricating allegations of time clock fraud and providing him no opportunity to defend himself.

41. Defendant, by and through its managerial and supervisory employees, retaliated against Mr. Harris by terminating him because he complained he was being harassed and subjected to a hostile work environment based on his race.

42. As a direct, proximate, and reasonably foreseeable result of Defendant's retaliation as described herein, Mr. Harris has suffered and continues to suffer damages, including but not limited to, lost wages, emotional distress, pain and suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary damages.

43. As a further direct, proximate, and reasonably foreseeable result of Defendant's retaliation as described herein, Mr. Harris is entitled to recover all damages and remedies available pursuant to law, including but not limited to, front pay, back pay, compensatory damages, punitive damages or liquidated damages, costs, attorneys' fees, etc.

## JURY DEMAND

Plaintiff demands a trial by jury on the claims asserted in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court for judgment against Defendant to the full extent permitted by 29 U.S.C. § 794a(a)(1), 42 U.S.C. § 2000e-5(f)-(k), and 42 U.S.C. § 1981, including but not limited to the following:

1. Judgement in Plaintiff's favor, determining that Defendant's conduct toward and relating to Plaintiff violated Title VII of the Civil Rights Act of 1864 and the Civil Rights Act of 1991;

2. Award Plaintiff all monetary damages incurred, including but not limited to, back pay, front pay, interest, and benefits;

3. Award Plaintiff damages for mental anguish, emotional distress, and other non-pecuniary damages;

4. Award Plaintiff liquidated and/or punitive damages as a result of the intentional unlawful actions and conduct of Defendant under the Civil Rights Act of 1964 and the Civil Rights Act of 1991;

5. Award Plaintiff the costs, disbursements, expenses, reasonable attorneys' fees, and expert witness fees incurred by Plaintiff in filing and prosecuting this action pursuant to 42 U.S.C. § 1981a and/or as may be authorized by any other applicable federal and state laws;

6. For an award of pre- and post-judgment interest to Plaintiff on all damages; and

7. For all other, further relief as this Court deems just and appropriate.

This the 11th day of December, 2023.

**GREEN MISTRETTA LAW, PLLC**

/s/ Aliyah S. Adams
Dawn T. Mistretta, N.C. State Bar No. 31691
Aliyah S. Adams, N.C. State Bar No. 58756
1752 Heritage Center Drive, Suite 101
Wake Forest, North Carolina 27587
Telephone: (919) 278-7453
Facsimile: (855) 876-8893
dmistretta@gmlawyers.org
aadams@gmlawyers.org
*Counsel for Plaintiff*